**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

RECEIVED
USDC, CLERK CHARLESTON, SC
2011 DEC 22  A 10: 54

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 2:11-cv-2958 |
| State of South Carolina and Nikki R. | ) | |
| Haley, in her official capacity as the | ) | |
| Governor of the State of South Carolina, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| Lowcountry Immigration Coalition, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:11-cv-2779 |
| | ) | |
| Nikki R. Haley, in her official capacity as | ) | |
| the Governor of the State of South Carolina, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

**ORDER**

This matter comes before the Court on motions for preliminary injunction filed by

plaintiffs in the two above-captioned matters. These actions arise out of legislation adopted by

the South Carolina General Assembly on June 27, 2011 (hereafter referred to as "Act 69" or "the

Act"). Act 69 attempts to address a broad range of immigration related issues through, *inter alia*,

the adoption of various state criminal provisions, employer sanctions and mandates to local law

1

enforcement regarding the identification and apprehension of persons unlawfully present in the United States. Plaintiffs in the two separate actions assert similar, but not identical, constitutional challenges to various sections of Act 69 and seek to preliminarily enjoin the implementation of portions of the challenged state statute, which will otherwise become effective on January 1, 2012. All parties to this action have submitted extensive briefs relating to the pending motions for preliminary injunction, and the Court heard several hours of oral argument on December 19, 2011. The Court addresses these motions below.

## Factual Background

The South Carolina General Assembly took up the matter of state immigration legislation in the 2011 legislative session because of a perceived failure of the United States to "secure our southern border," which "really jeopardize[s] our national security." (Dkt. No. 29-25 at 13).[1] The Act was designed to deal with "issues regarding folks being in South Carolina unlawfully [and] not having proper identification." (*Id*. at 2). The South Carolina Senate conducted four public hearings across the State in the fall of 2010 regarding local problems with unlawful immigration. (*Id.*)

In the course of legislative debate, legislators acknowledged that the proposed legislation might be subject to legal challenge. One of the Senate sponsors of the bill stated during floor debate that "we get real close to the line in some respects," and a supporter stated, "since there is a severability clause, I want to go ahead and be as muscular and push as hard as we can in terms of what our state rights are." (Dkt. No. 29-25 at 11; Dkt. No. 29-26 at 24). Another senator,

---

[1] In this Order, all references to docket entries refer to entries in the case brought by the private plaintiffs, Civil Action No. 2:11-2779, except for the references to docket entry 16, which are references to the United States' motion for preliminary injunction and its attachments in the case brought by the United States, Civil Action No. 2:11-2958, and the reference to docket entry 43, which is a reference to the defendants' response to the United States' motion for preliminary injunction in Civil Action No. 2:11-2958.

who opposed the legislation, stated during floor debate that the bill was "clearly unconstitutional" and would "subject[] this state government to attorneys' fees." (Dkt. No. 29-26 at 37-38).

One of the bill's sponsors acknowledged during Senate floor debate that the State had the option of entering into a written agreement with the federal government regarding immigration enforcement (known as "287(g) agreements") and that "it would be much better" if an agreement "had been entered into between the Chief of SLED[2] and the federal government." (Dkt. No. 29-25 at 14). Rather than attempting to enter into a 287(g) agreement with the federal government as expressly authorized by the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1357(g)(1), the State elected to go forward with its own immigration bill, which included state criminal sanctions, because it was "really important" to have State "control." (Dkt. No. 29-25 at 14). Supporters of the bill voiced the hope that the Act would encourage persons unlawfully present in South Carolina to find "a different state to go to." (Dkt. No. 16-1 at 4 & n.1; Dkt. No. 29-26 at 4). Supporters also stated their expectation that the Act would make the federal government's "phone ring[] off the hook." (Dkt. No. 29-25 at 24).

The final bill for Act 69 contained twenty separate sections. Several sections closely track existing federal statutes relating to the harboring and sheltering of unlawfully present persons, possessing alien registration materials and making counterfeit picture identification materials. *See* Act 69, §§ 4(B) and (D), 5 and 15. The Act allows state enforcement and prosecution of what previously were exclusively federal offenses. Other provisions of the Act, apparently unique in American law, make it a state crime for unlawfully present persons to shelter, harbor or transport themselves. *Id.* § 4(A) and (C). Another section of the Act directs all

---

[2] "SLED" is the acronym for the South Carolina Law Enforcement Division.

state and local law enforcement officers making a traffic stop or arrest and having a "reasonable

suspicion" that the person may be unlawfully present in the United States to "make a reasonable

effort, when practicable, to determine whether the person is lawfully present in the United

States." *Id*. § 6(A). This section goes on to identify various "valid" forms of identification

which create a presumption that the person is lawfully present in the United States. *Id*. § 6(B). If

the person being arrested or stopped does not have one of these state-approved forms of

identification in his or her possession, then the law enforcement officer "shall make a reasonable

effort, when practicable, to verify the person's lawful presence in the United States." *Id*. § 6(C).

If the person is determined to be unlawfully present, state or local law enforcement officers are

authorized to "securely transport the person to a federal facility in this State." *Id*. § 6(C)(4).

The Act further addresses employer sanctions, establishing an elaborate scheme of

employer licenses and making it unlawful for an employer to knowingly employ "an

unauthorized alien." *Id*. §§ 8-14. Another provision mandates the determination of whether any

person arrested and detained at a jail or prison facility in South Carolina is unlawfully present in

the United States. *Id*. § 7. An additional provision authorizes private rights of action against any

political subdivision enacting an ordinance interfering with enforcement of Act 69 or violating

the law intentionally. *Id*. § 1. The Act also establishes an Illegal Immigration Enforcement Unit

within SLED and provides that the "director shall negotiate the terms of a memorandum of

agreement with the United States Immigration and Customs Enforcement [("ICE")] pursuant to

Section 287(g) of the federal INA as soon as possible after the effective date of this act." *Id*. §

17(A) and (E). Finally, the Act contains a savings clause, severability clause and a section

establishing the effective date of the Act. *Id*. §§ 18-20.

4

Act 69 was considered and approved by the South Carolina General Assembly during a time period in which a number of states adopted similar immigration statutes and then faced legal challenges to the newly adopted legislation in federal court. The first state to adopt a comprehensive immigration statute was Arizona. Portions of its statute relating to the failure to carry registration materials and the verification of immigration status of persons questioned in the course of traffic stops were preliminarily enjoined by the district court, and that decision was subsequently affirmed 2-1 by a panel of the Ninth Circuit. *United States v. Arizona*, 703 F. Supp. 2d 980 (D. Ariz. 2010), *aff'd*, 641 F.3d 339 (9th Cir. 2011). The United States Supreme Court recently granted certiorari in that case. *Arizona v. United States*, No. 11-182, 2011 WL 3556224 (U.S. Dec. 12, 2011).

On June 24, 2011, an Indiana federal district court temporarily enjoined portions of a new Indiana state law limiting the use by foreign nationals of consular I.D.s for identification and authorizing the making of warrantless arrests for non-criminal conduct. *Buquer v. City of Indianapolis*, No. 11-708, 2011 WL 2532935 (S.D. Ind. June 24, 2011). Three days later, on June 27, 2011, a federal district court in the Northern District of Georgia temporarily enjoined portions of a newly adopted Georgia statute that created state criminal sanctions for harboring and transporting unlawful aliens and mandated verification of the immigration status of any person suspected of committing a crime. *Ga. Latino Alliance for Human Rights v. Deal*, 793 F. Supp. 2d 1317 (N.D. Ga. 2011). Subsequently, the Alabama district court and the Eleventh Circuit temporarily enjoined portions of an Alabama state immigration statute prohibiting the harboring or transporting of unlawfully present aliens and requiring the carrying of alien registration documents. *United States v. Alabama*, No. 11-2746, 2011 WL 4469941 (N.D. Ala. Sept. 28, 2011) and *Hispanic Interest Coal. of Ala. v. Bentley*, No. 11-2484, 2011 WL 5516953

(N.D. Ala. Sept. 28, 2011), *injunction pending appeal granted in part and denied in part*, Nos. 11-14532, 11-14535, 2011 WL 4863957 (11th Cir. Oct. 14, 2011). The district court and the Eleventh Circuit, however, declined to grant a temporary injunction regarding a portion of the Alabama statute allowing for the verification of the immigration status of persons stopped by law enforcement officers. *Id.*

In the above-captioned action brought by the United States, only four of the twenty sections of Act 69 are challenged. The challenged sections include provisions in which the State of South Carolina essentially adopts federal statutes and creates new state criminal sanctions relating to the harboring and transporting of unlawfully present persons (Subsections 4(B) and (D)), the failure to carry alien registration materials (Section 5) and the creation of fraudulent identification documents (Section 15). The United States also challenges the provisions making it a state crime for an unlawfully present person to transport or shelter himself (Subsections 4(A) and (C)) and the directive to local and state law enforcement officials to determine the immigration status of certain persons encountered in routine traffic stops and other contacts in which there is a "reasonable suspicion" that the person may be in the United States unlawfully (Section 6). The private plaintiffs also challenge Sections 4, 5 and 6 of the Act (but not Section 15) and further assert that the provisions requiring the determination of the immigration status of persons detained in state and local jails (Section 7) and authorizing a private right of action to enforce the Act (Section 1) are unlawful. The private plaintiffs also make a preemption challenge to the Act in its entirety.

Below, the Court initially addresses various preliminary issues, including standing, existence of a federal cause of action and jurisdiction, the preemption doctrine and standards for preliminary injunction. The Court then addresses the plaintiffs' likelihood of success on the

6

merits of their preemption challenges to the sections of Act 69 for which the plaintiffs have standing. Finally, the Court addresses the remaining elements of the preliminary injunction standard and the issue of remedy.

**Preliminary Issues**

### A. Standing

Standing "is a threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The plaintiff bears the burden of demonstrating "a personal stake in the outcome of the controversy" that will be sufficient to warrant the party's "invocation of federal court jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). This requires the plaintiff to show: (1) "he is under threat of suffering 'injury in fact' that is concrete and particularized"; (2) "the threat [is] actual and imminent, not conjectural or hypothetical"; (3) the threatened injury is "fairly traceable to the challenged action of the defendant"; and (4) it is likely that "a favorable judicial decision will prevent or redress the injury." *Id.* An organization has standing to sue as a representative of its members if the individual members have standing to sue, the interests sought to be protected are germane to the organization's purpose and the suit does not require the participation of the individual members. *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 99 (4th Cir. 2011). A plaintiff who challenges a statute must face a realistic danger of sustaining a direct injury, but the plaintiff need not await actual suffering of that injury, such as an arrest, to obtain preventive relief. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).

In these actions, defendants do not contest the standing of the United States to assert challenges to Sections 4, 5, 6 and 15 of the Act. Defendants also do not contest the standing of the private plaintiffs to assert challenges to Sections 4, 5 and 6 of the Act. Defendants do,

however, contest the standing of the private plaintiffs to assert a challenge to the Act in its

entirety on the basis of the alleged impermissible impact on the nation's foreign affairs and the

Act's alleged impermissible burdening of federal financial resources.  Defendants also contest

the standing of the private plaintiffs to assert challenges to Sections 1 and 7 of the Act.

The Court recognizes its duty to make an independent determination of standing

notwithstanding the defendants' decision not to contest the plaintiffs' standing to assert

challenges to Sections 4, 5, 6 and 15 of the Act.  The complaint of the United States clearly sets

forth the basis of its standing to challenge Sections 4, 5, 6 and 15 of the Act.  *See* Compl. ¶¶ 2-6,

15-32.  The private plaintiffs' complaint also sets forth sufficient allegations to establish standing

to challenge Sections 4, 5 and 6 of the Act.  *See* Compl. ¶¶ 44, 45, 48, 49.

The Court has trouble identifying the type of concrete and particularized injury that is

sufficiently actual and imminent to satisfy standing requirements with regard to the private

plaintiffs' challenge to the Act in its entirety on the basis of the impact on foreign affairs and

federal financial resources, or with regard to the private plaintiffs' challenges to Sections 1 and 7

of the Act.  The alleged injuries the private plaintiffs face as a result of Act 69's impact on

foreign affairs and federal financial resources are too remote and speculative to confer standing.

Private plaintiffs also do not face any concrete and particularized injury that is actual and

imminent as a result of Section 1, which simply authorizes private civil actions against local

political subdivisions who do not enforce the Act.

Section 7 requires the verification of the immigration status of any person incarcerated or

detained in a jail facility and provides for potential delivery of incarcerated persons to federal

facilities if they are determined to be unlawfully present in the United States.  Initially, Section 7

appears to expose several of the private plaintiffs to a potential injury that is concrete and

particularized since the operation of Sections 4, 5 and 6 of the Act may result in one or more private plaintiffs being arrested and detained at a local or state prison facility. *See Hispanic Interest Coal. of Ala.*, 2011 WL 5516953, at \*44 (finding that private plaintiffs had standing to challenge a provision which only applied to detained persons where private plaintiffs showed likelihood that they may be subject to detention pursuant to specific laws). In other words, the injury which private plaintiffs could potentially suffer as the result of Section 7 is primarily dependent upon the implementation of Sections 4, 5 and 6 of the Act. (*See* Dkt. No. 93 at 26 (private plaintiffs arguing that they have standing to challenge Section 7 on the basis that they may be arrested pursuant to Sections 4, 5 or 6 of the Act)). However, as discussed later in this Order, the Court finds that the United States and the private plaintiffs are likely to succeed on the merits of their challenges to Sections 4, 5 and 6 of the Act and will temporarily enjoin the enforcement of those challenged sections. As a consequence of the Court's action regarding those sections, the potential injury to the named private plaintiffs appears to the Court too remote and speculative to satisfy the requirements for standing to challenge Section 7. The Court notes that none of the named private plaintiffs are alleged to be incarcerated or otherwise likely affected by the operation of Section 7.[3]

To summarize the Court's rulings on standing, the United States has standing to challenge Sections 4, 5, 6 and 15 of the Act, and the private plaintiffs have standing to challenge Sections 4, 5 and 6 of the Act. The private plaintiffs do not have standing to make a preemption challenge to Act 69 in its entirety or to challenge Sections 1 and 7 of the Act.

---

[3] The United States has not challenged Section 7.

9

### B. Federal Cause of Action and Jurisdiction

Defendants assert that neither the United States nor the private plaintiffs have a federal cause of action which allows them to challenge Act 69 on the basis that it is preempted by federal law. (Dkt. No. 43 at 14-25). Specifically, defendants argue that plaintiffs have no right of action under the Supremacy Clause and may not assert a Supremacy Clause claim as a matter of right under 42 U.S.C. § 1983. Defendants then reach the conclusion that, since plaintiffs assert what defendants characterize as simply Supremacy Clause claims, both the United States government and the private plaintiffs, potentially facing significant legal injury arising out of Act 69, are powerless to challenge the deprivation of their rights in federal court. This cannot be and is not the law.

Defendants are correct that the Supremacy Clause itself "is not a source of any federal rights"; instead, it "secure[s] federal rights by according them priority whenever they come in conflict with state law." *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 613 (1979). As the Supreme Court explained in *Chapman*, "all federal rights, whether created by treaty, by statute, or by regulation, are 'secured' by the Supremacy Clause." *Id*. Section 1983 provides a federal remedy for the "deprivation of any rights, privileges or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983.

In this case, both the United States and the private plaintiffs assert rights which are secured by the Constitution and the laws. First, the United States asserts that the federal government's constitutionally guaranteed control of naturalization, foreign affairs and foreign commerce is impaired and undermined by Act 69. *See* U.S. Const. art. I, § 8, cl. 3, 4; *id*. art. II, § 2, cl. 2. Second, the private plaintiffs assert that in the event that a private plaintiff is arrested, detained and/or incarcerated on the basis of a state statute rendered unlawful because it is

10

preempted by federal statutory or constitutional law, such seizure or deprivation of the person's

freedom of movement would constitute a violation of the Fourth and Fourteenth Amendments of

the United States Constitution.  Third, the private plaintiffs assert that the unlawful

implementation of a state criminal statute regulating immigration, when such a matter is

exclusively within the control of the federal government pursuant to the INA, 8 U.S.C. § 1101 *et

seq.*, would violate an adversely affected person's legal rights under the INA.

 With regard to the defendants' challenge to the private plaintiffs' right to bring this

action, the determination of whether a federal constitutional or statutory provision creates a

remedy under § 1983 involves a two step inquiry.  First, "the plaintiff must assert the violation of

a federal right." *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106 (1989).

The Court is to look to the constitutional or statutory provision in question and determine

whether it creates rights intended to benefit the plaintiff.  *Id.*  Second, if the Court determines

that the statutory or constitutional provision does create a federal right, the defendant may then

show that Congress intended to foreclose a remedy under § 1983.  *Id.*

 Here, it is clear from the plain language of the constitutional and statutory provisions at

issue that the private plaintiffs have asserted federal rights in which § 1983 provides a remedy.

The private plaintiffs, potentially subject to arrest and incarceration from arguably invalid state

immigration statutes, have clearly identified rights under the Fourth and Fourteenth Amendments

which can be asserted in such circumstances as presented here under § 1983.  Furthermore, the

INA presents a comprehensive enforcement scheme exclusively under federal control, and this

scheme creates the right by persons subject to the INA to be free from state statutory provisions

conflicting with or preempted by the federal Act.  In a recent decision by the district court in the

Northern District of Georgia addressing a challenge to the Georgia immigration statute by

11

private plaintiffs, the court stated without equivocation that "the Immigration and Naturalization Act . . . creates a right enforceable under § 1983." *Ga. Latino Alliance for Human Rights*, 793 F. Supp. 2d at 1327.

The Court finds instructive the long line of cases involving federal court decisions addressing the state regulation of immigration, all of which involved alleged violations of federal rights and all of which were brought by private plaintiffs. In a case this past term, the United States Supreme Court addressed the right of the state of Arizona to adopt various employer sanctions relating to the employment of unlawfully present aliens. *See Chamber of Commerce of the U.S. v. Whiting*, 131 S. Ct. 1968 (2011). The challenge to the Arizona statute was brought by the United States Chamber of Commerce on behalf of its members and addressed the scope of federal preemption of the state immigration-related legislation. Surely if the United States Chamber of Commerce, on behalf of its members, has a federal cause of action to challenge a state statute affecting immigration on the basis of alleged federal preemption, then it stands to reason that the individuals adversely affected by an allegedly unlawful state immigration law would also have a federal cause of action to challenge such a state law that would allegedly deprive them of rights secured by the Constitution and laws of the United States.

In *Toll v. Moreno*, 458 U.S. 1 (1982), the Supreme Court dealt with the rights of students whose parents had non-immigrant alien visas to qualify for in-state tuition at Maryland state universities. The Court addressed the plaintiffs' rights under the Fourteenth Amendment and the INA and determined that the state policy was preempted by federal law. *Id.* at 13-17. Further, the Supreme Court in *Hines v. Davidowitz*, 312 U.S. 52 (1941), voided a Pennsylvania alien registration law, in an action brought by a private individual, on the basis that the state statute was preempted by broad federal control over immigration policy. Additionally, in what was

among the first and historically one of the most significant challenges to a state immigration

statute in American history, the United States Supreme Court in *Chy Lung v. Freeman*, 92 US

275 (1875), struck, on preemption grounds, a California statute which permitted a state official to

exact a bounty from recently arriving immigrants as the price of admission into the United

States. The lawsuit was brought by a private plaintiff, described by the Court as "a subject of the

Emperor of China." *Id.* at 276.

To accept defendants' argument that private plaintiffs have no cause of action to

challenge unlawful state immigration statutes would require this Court to rewrite American legal

history and strike from the legal precedents some of the most foundational and majestic decisions

in the Supreme Court's history. The Court finds no basis in law to support such an argument.

The Court finds that the private plaintiffs have asserted sufficient allegations to state a claim

under § 1983.

Similarly, the Court rejects the defendants' argument that the United States, through the

office of the Attorney General of the United States, does not have a right to challenge Act 69 on

the basis that it is preempted by the INA and provisions of the United States Constitution vesting

in the national government the authority to conduct foreign policy, regulate foreign commerce

and administer a uniform system of naturalization. In *United States v. San Jacinto*, 125 U.S.

273, 279-80 (1888), the United States Supreme Court rejected the argument that the Attorney

General lacked the inherent power to bring an action to void a fraudulently obtained land patent

issued by the United States government. Although recognizing that the Attorney General had no

"express authority" to bring such a suit, the Court indicated that the national government was not

so "helpless" and had the "apparent authority" to institute an action where its rights were

involved. *Id.*

The authority of the Attorney General to institute a suit was again challenged in *Sanitary District of Chicago v. United States*, 266 U.S. 405 (1925), which involved a plan of a local governmental agency to withdraw large volumes of water from the Great Lakes and potentially adversely affect the navigable waters under the control of the national government. The Supreme Court made short work of this contention, noting that "[t]his is not a controversy between equals." *Id.* at 425. Observing that the suit involved the "United States . . . asserting its sovereign power to regulate commerce and to control the navigable waters within its jurisdiction," the Court concluded that the "Attorney General by virtue of his office may bring this proceeding and no statute is necessary to authorize it." *Id.* at 425-26; *see also United States v. California*, 332 U.S. 19, 26-29 (1947) (holding that the Attorney General has "statutorily granted power to invoke [the federal court's] jurisdiction" as a result of "very broad authority . . . to institute and conduct litigation in order to establish and safeguard government rights and properties"); *Kern River Co. v. United States*, 257 U.S. 147, 154-55 (1921) (holding that "the general authority of the Attorney General in respect to pleas of the United States and the litigation which is necessary to establish and safeguard its rights affords ample warrant for the institution and prosecution by him" of forfeiture suits on behalf of the government); *Abraham v. Hodges*, 255 F. Supp. 2d 539, 549 (D.S.C. 2002) (upholding the authority of the national government under the Commerce Clause to challenge the actions of the governor of South Carolina seeking to prevent the importation of nuclear waste to federal facilities within the state); 28 U.S.C. §§ 515, 516, 517, 518 and 519. It is an interesting historical fact that when *Chy Lung*, the 1875 case that established the first legal precedent for federal control over immigration matters, was argued before the United States Supreme Court, Attorney General Edwards Pierrepont personally appeared to argue on behalf of the plaintiff and in support of the federal

14

government's authority over foreign affairs and immigration matters. 92 U.S. at 276-77. No legal developments since *Chy Lung* have diminished the Attorney General's authority to assert and defend the powers of the national government granted by the Constitution.

In sum, the Court finds that the Attorney General has broad and sufficient authority to assert claims, such as those before the Court, which defend and affirm the national government's powers and prerogatives regarding the conduct of foreign relations, foreign commerce and a uniform system of naturalization. Defendants' argument that the Attorney General requires express Congressional authority is contrary to the Supreme Court's long and distinguished history in upholding the United States' authority to assert its rights and claims in the United States district courts. To rule otherwise would render the powers of the federal government a nullity.

Further, the Eleventh Amendment does not bar the private plaintiffs' suit. The "Eleventh Amendment confirms that the fundamental principle of sovereign immunity limits the grant of judicial authority in [Article] III." *Green v. Mansour*, 474 U.S. 64, 68 (1985). Generally speaking, because of the Eleventh Amendment, states may not be sued in federal court without consent or an intent by Congress to abrogate the state's sovereign immunity. However, under *Ex parte Young*, 209 U.S. 123, 155-56, 159 (1908), suit may be brought in federal court to "grant[] prospective injunctive relief to prevent a continuing violation of federal law." *Green,* 474 U.S. at 68. Such is the case here, in that the private plaintiffs seek relief on the ground that Act 69 conflicts with Congress' power to regulate immigration and is preempted by a federal statutory scheme.

Finally, this Court has federal question jurisdiction under 28 U.S.C. § 1331. "It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering

15

with federal rights." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983) (citing *Ex parte Young*, 209 U.S. at 160-62). "A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." *Id.*

### C. Preemption

The Supremacy Clause of the United States Constitution provides that the Constitution and laws of the United States "shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. IV, cl. 2. The laws of the United States are "supreme," and the "law of the State . . . must yield to it." *Gibbons v. Ogden*, 22 U.S. 1, 82 (1824). "[T]he purpose of Congress is the ultimate touchstone in every preemption case." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009).

Federal preemption of a state law may be express or implied and "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purposes." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992). Express preemption occurs when Congress "expressly declares its intent to preempt state law." *Pinney v. Nokia*, 402 F.3d 430, 453 (4th Cir. 2005). There are at least two types of implied preemption: field preemption and conflict preemption. *Gade*, 505 U.S. at 98; *Hines*, 312 U.S. at 67.

Field preemption occurs "where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Gade*, 505 U.S. at 98. The regulation of immigration is the quintessential example of field preemption. The Supreme Court succinctly stated in *DeCanas v. Bica*, 424 U.S. 351, 354 (1976), that the

16

"[p]ower to regulate immigration is unquestionably exclusively a federal power." As Justice

Black explained in *Hines*, a case involving an attempt by the state of Pennsylvania to adopt an

identical state version of the federal alien registration law, "where the federal government, in the

exercise of it superior authority in this field, has enacted a complete scheme of regulation and

has therein provided a standard for registration of aliens, states cannot, inconsistently with the

purpose of Congress, conflict or interfere with, curtail or complement, the federal law, or enforce

additional or auxiliary regulations." 312 U.S. at 66.  An exception to field preemption exists

only where states have traditionally regulated in that area or where Congress has expressly

reserved that power to the states. *Whiting*, 131 S. Ct. at 1974, 1977 (recognizing an exception to

field preemption for state-adopted employer sanctions because states have traditionally regulated

employment and Congress explicitly excepted state licensing laws from preemption in the INA).

Conflict preemption occurs "where compliance with both federal and state regulations is

a physical impossibility" or where state law "stands as an obstacle to the accomplishment and

execution of the full purposes and objectives of Congress." *Gade*, 505 U.S. at 98.  One of the

ways in which a state law may stand as an obstacle to full implementation of federal law is where

the state law "interferes with the methods by which the federal statute was designed to reach [its]

goal." *Id.* at 103.  States cannot avoid preemption of challenged state laws simply on the

argument that the state and the federal government have the same "ultimate goal." *Id.*  In

evaluating a potential conflict preemption issue, the Court is to undertake a two step process.

First, the Court must analyze the applicable state and federal statutes.  Second, the Court must

determine if they are in fact in conflict. *Chi. & N. W. Transp. Co. v. Kalo Brick & Tile Co.*, 450

U.S. 311, 317 (1981).

17

The Court should start any preemption analysis with a presumption against preemption. *Wyeth*, 555 U.S. at 565. This presumption is particularly strong where Congress has legislated in an area the states have traditionally occupied. *Id.* Conversely, the presumption against preemption is not strong in areas where the states have not traditionally legislated, most particularly in areas which are "inherently federal in character." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001). It is notable that in a number of recent decisions involving the adoption of state immigration statutes, courts have generally declined to apply a presumption against preemption because the field of immigration has traditionally been a responsibility of the federal government and not the states. *See United States v. Arizona*, 641 F.3d at 348; *Ga. Latino Alliance for Human Rights*, 793 F. Supp. 2d at 1330; *United States v. Alabama*, 2011 WL 4863957, at \*12, 30, 39. Whatever presumption against preemption exists generally has been demonstrably overcome here by the facts before the Court, including the traditionally predominant role of the federal government in the field of immigration, and in the related fields of foreign affairs and foreign commerce, and the limited role in the past of the states, including South Carolina, in the area of immigration regulation.[4]

---

[4] Plaintiffs' preemption challenges to various sections of Act 69 pursuant to the Supremacy Clause are necessarily "facial" challenges, as Act 69 is not yet in effect. To the extent the plaintiffs are able to establish that portions of Act 69 are preempted by federal law pursuant to the rules of preemption discussed above, the "facial" nature of plaintiffs' challenge is not important. *See United States v. Arizona*, 641 F.3d at 345-46 (holding that, for purposes of defendants' argument that the plaintiffs' challenge to the law was "facial" and not "as applied," "there can be no constitutional application of a statute that, on its face, conflicts with Congressional intent and is therefore preempted by the Supremacy Clause"). As noted by the Ninth Circuit, recent Supreme Court cases analyze "facial" preemption challenges without mentioning the standard for facial challenges. *Id.* (citing *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) and *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003)).

### D. Standards for Preliminary Injunction

A preliminary injunction is an "extraordinary and drastic remedy" and "is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 690 (2008). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). As the Fourth Circuit explained in *In re Microsoft Corp. Antitrust Litigation*, 333 F.3d 517, 525 (4th Cir. 2003), "[t]he traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits."

A moving party must establish the presence of the following: (1) "a clear showing that it will likely succeed on the merits"; (2) "a clear showing that it is likely to be irreparably harmed absent preliminary relief"; (3) the balance of equities tips in favor of the moving party; and (4) a preliminary injunction is in the public interest. *Real Truth About Obama, Inc. v. Fed. Election Comm.*, 575 F.3d 342, 346-47 (4th Cir. 2009); *W. Va. Assoc. of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009). These standards follow the newly articulated requirements for preliminary injunction set forth by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22-23 (2008). Unlike the Fourth Circuit's previous "balance of hardship" test set forth in *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189, 196 (4th Cir. 1977), the moving party seeking a preliminary injunction must establish the presence of each of the four requirements, satisfying the standards of each as articulated. *Real Truth About Obama, Inc.*, 575 F.3d at 347.

### Challenges to Specific Sections of Act 69

The United States has challenged Sections 4, 5, 6 and 15 of Act 69, all which the Court

has determined it has standing to challenge.  The private plaintiffs, like the United States, have

challenged Sections 4, 5 and 6, and the private plaintiffs have additionally challenged the Act in

its entirety, as well as Sections 1 and 7.  The Court has determined, however, that the private

plaintiffs do not have standing to challenge the Act in its entirety or Sections 1 and 7.  Thus, the

Court will address below the motions for preliminary injunction only as to Sections 4, 5, 6 and

15.  The Court will not address the provisions of any other section of Act 69.

The Court will initially address those provisions of Act 69 which adopt or closely track

the provisions of existing federal immigration statutes.  These provisions–found at Subsections

4(B) and (D), Section 5, Subsection 6(B)(2) and Section 15–seek to take what were previously

only federal crimes subject to federal prosecution and federal enforcement procedures, and make

them also state crimes subject to state prosecution and state enforcement procedures.  Plaintiffs

assert that the enforcement of federal immigration law involves the exercise of law enforcement

and prosecutorial discretion based upon well-developed federal priorities and the balancing of

sometimes conflicting and competing national interests.  The United States asserts that the

establishment of separate and independent state enforcement procedures would likely conflict

with and disrupt federal interests and priorities, both in the area of law enforcement and in the

areas of foreign relations and foreign commerce.

The Court will then address Subsections 4(A) and (C), which make it a state crime for an

unlawfully present person to transport, shelter or harbor himself or herself.  The plaintiffs assert

that these provisions essentially make it a crime to be unlawfully present, which they assert is

contrary to and in conflict with federal immigration law.  Finally, the Court will address the

provisions of Section 6 which direct state and local law enforcement officers, when encountering

persons whom they have a "reasonable suspicion" are unlawfully present in the United States, to

conduct an inquiry into their status and take action should they determine that such persons are in

fact unlawfully present. The United States asserts that such a state-mandated law enforcement

scheme is contrary to federal immigration priorities, which focus upon unlawfully present

persons who are national security and public safety risks, and would burden and disrupt federal

immigration enforcement efforts and the national government's administration of foreign policy.

### A. Challenges to State Criminalization of Federal Immigration Laws

#### 1. Subsections 4(B) and (D)

Subsections 4(B) and (D) of Act 69 make it a state felony punishable by up to five years

in prison to "transport, move or attempt to transport" or "conceal, harbor or shelter" a person

"with intent to further that person's unlawful entry into the United States" or to help that person

avoid "apprehension or detection . . . by state or federal authorities."[5] Federal law has long made

it unlawful to "transport or move" or "conceal[], harbor[] or shield[]" an unlawful alien. 8

U.S.C. § 1324(a)(1)(A)(ii) and (iii). The federal law authorizes state and local law enforcement

officers to make arrests for § 1324 violations, but prosecution is exclusively a federal prerogative

with prosecution and interpretation of the federal law handled by the federal courts. *Id.* §

1324(c).

The federal harboring and transporting statute, § 1324(a)(1)(A)(ii) and (iii), is part of a

larger statutory scheme which addresses comprehensively the actions of third parties aiding and

assisting unlawful aliens. Other provisions in this statutory scheme penalize persons unlawfully

bringing aliens into the United States, 8 U.S.C. § 1323(a), and persons who import aliens for

immoral purposes, 8 U.S.C. § 1328. Congress has expressly carved out a role for state and local

law enforcement officers in this comprehensive statutory scheme, allowing them to make arrests

---

[5] These provisions were adopted by the South Carolina General Assembly initially in 2008 and can be found at S.C. Code § 16-9-460.

for § 1324 violations, while preserving control of prosecutions and judicial interpretation to federal officials. Subsections 4(B) and (D) disrupt this comprehensive federally controlled immigration enforcement scheme by placing state prosecutors in control of enforcement efforts under Subsections 4(B) and (D) and permitting state judges to interpret the harboring and transporting statutes.

The United States asserts that Subsections 4(B) and (D) are preempted because "South Carolina is improperly imposing its own substantive regulation over the movement of aliens in the United States," something it asserts is the exclusive province of the federal government. (Dkt. No. 16-1 at 21). The United States further asserts that the independent state penalties and prosecution "operate wholly beyond federal control." (*Id.*) Such an approach by the State, argues the United States, "removes any federal discretion and impermissibly places the entire operation–including arrest, incarceration and statutory interpretation–squarely within the State's control." (*Id.* at 22). Further, the federal statute creates a safe harbor from prosecution for persons and bona fide religious organizations who bring an alien to the United States to "perform the vocation of minister or missionary." 8 U.S.C. § 1324(a)(1)(C). Subsections 4(B) and (D) do not contain such a safe harbor provision, creating the potential scenario where a person acting lawfully under the federal harboring statute could be prosecuted by state officials for conduct expressly excepted from federal criminal law.

Recent court decisions have addressed similar state harboring and transporting statutes. In *United States v. Alabama*, the district court preliminarily enjoined a state harboring and transporting statute, noting both the loss of federal control over prosecution and judicial interpretation and conflicts between the state and federal statutes. The Alabama district court also noted that this was not an area traditionally regulated by the state of Alabama. 2011 WL

4469941, at *41-43.  The district court reviewing the Georgia immigration statute, *Georgia Latino Alliance for Human Rights v. Deal*, reached a similar conclusion regarding Georgia's version of the harboring and transporting statute.  The court, in granting a preliminary injunction, concluded that the Georgia statute was an attempt to "replace the discretionary and interpretative mechanism of the federal government" with control by the state government.  793 F. Supp. 2d at 1336.  The district court concluded that this was not acceptable because state and federal officials may have different priorities, and the federal government must balance "difficult (and often competing) objectives, of 'protecting national security, protecting public safety and securing the border.'"  *Id.* at 1335 (quoting *United States v. Arizona*, 641 F.3d at 352).

It is clear to the Court, after carefully comparing the relevant provisions of the INA, particularly §§ 1323, 1324 and 1328, and Subsections 4(B) and (D) of Act 69, that Congress adopted a scheme of federal regulation regarding the harboring and transporting of unlawfully present persons so pervasive that it left no room in this area for the state to supplement it.  *Gade*, 505 U.S. at 98.  Thus, this is a classic case of field preemption.  The adoption of Subsections 4(B) and (D) was part of a larger state effort to alter federal immigration enforcement priorities and to assert state control over such policy decisions.  (Dkt. No. 29-25 at 14).  While the Court does not doubt the good faith of the South Carolina General Assembly in attempting to address the immigration issue, the Constitution of the United States and the INA have placed the policy-making role regarding immigration in the hands of the national government.  *Hines*, 312 U.S. at 401-04.  Further, in light of the express exception within § 1324 authorizing state and local law enforcement officers to make arrests under that section, it is clear to the Court that Congress did not intend to allow the states any further role beyond arresting persons allegedly harboring or transporting unlawfully present persons.  Moreover, this is not an area traditionally regulated by

23

the state.  Additionally, the inconsistent safe harbor provisions of state and federal law result in conflict preemption.

Therefore, the Court concludes that plaintiffs have made a clear showing that they will likely succeed on the merits of their challenge to Subsections 4(B) and (D), satisfying the first of four prongs for the grant of preliminary injunctive relief.  The Court will address the balance of the preliminary injunction standards regarding Subsections 4(B) and (D) in the remedy section of this Order.

### 2. Section 5, Subsection 6(B)(2) and Section 15

Section 5 of Act 69 makes it unlawful for any person 18 years or older "to fail to carry" in his or her possession "a certificate of alien registration or alien registration receipt card issued to the person pursuant to 8 U.S.C. § 1304."  The language of this Section closely tracks the federal registration statute, 8 U.S.C. § 1304(e).  The adoption of the state provision would permit state control of prosecutions for failure to carry federally issued registration materials, something that is, now and historically, exclusively under the control of the national government.  Under the federal enforcement scheme, there are few prosecutions for failure to possess alien registration materials.  Indeed, it appears that from 1994-2009, there have been only 14 federal prosecutions for violating § 1304 in South Carolina.  (Dkt. No. 29-29 at 2).

According to an affidavit filed by the former general counsel of the Immigration and Naturalization Service, prosecutions are rarely undertaken under § 1304 because the system is outdated and the registration materials exclude numerous persons who are present lawfully.  (Dkt. No. 29-30 at 14-15).  Among the persons who may not be in possession of registration documents pursuant to § 1304 but who are lawfully present in the United States are petitioners under the Violence Against Women Act, persons granted humanitarian status based upon asylum

24

or protections of the Convention Against Torture, victims of trafficking who may have obtained

authorization from the Attorney General granting "continued presence" in the United States, and

I-918 petitioners for U-Visa status filed by survivors of serious crimes who are cooperating with

law enforcement authorities. (*Id.* at 16; Dkt. No. 16-3 at 7-18). These classes of persons would

not likely be prosecuted by the federal government but would nevertheless be subject to state

prosecution for failure to be in possession of registration materials issued pursuant to § 1304.

There is little doubt that alien registration is a field under the exclusive control of the

federal government. In fact, one of the seminal cases of federal law preemption of state

immigration laws is *Hines v. Davidowitz*, which involved the adoption by the state of

Pennsylvania of an alien registration law identical to the federal statute. 312 U.S. at 61. The

Supreme Court noted the foreign policy implications of competing state and federal registration

laws and the potential for such laws to create international tensions and reciprocal problems for

American nationals abroad. *Id.* at 63-65. The Supreme Court stated: "It cannot be doubted that

both the state and federal registration laws belong to that class of laws which concern the exterior

relation of this whole nation with other nations and governments." *Id.* at 66. In such a situation,

the state law on registration must "yield" to the federal law because the federal registration law is

the supreme law of the land. *Id.* Recent court decisions in Alabama and Arizona enjoined

provisions similar to Section 5. *See United States v. Alabama*, 2011 WL 4863957, at *6; *United States v. Arizona*, 703 F. Supp. 2d at 999.

An examination and comparison of Section 5 and the federal statutes relating to alien

registration documents demonstrate that the national government has adopted a pervasive and

comprehensive scheme that leaves no place for state regulation in this area. The State of South

Carolina has not traditionally regulated the area of alien registration materials. This is, again, a

classic case of field preemption.  Further, state enforcement of Section 5 creates the real risk that

persons lawfully present in the United States but not in possession of federal alien registration

materials would be subject to arrest, prosecution and incarceration, creating a conflict with

federal law and an obstacle to the full implementation of the objectives of Congress.  Thus, this

law is also preempted pursuant to conflict and obstacle preemption.

Subsection 6(B)(2) and Section 15 address the making, selling and possession of

counterfeit identification materials by persons unlawfully present in the United States.

Subsection 6(B)(2) makes it unlawful for any person to possess or use a counterfeit ID as proof

of lawful presence.  Section 15 makes it unlawful to make or sell counterfeit identification to a

person unlawfully present in the United States.  Federal law makes it a crime to counterfeit

federal immigration documents or to use such documents in an effort to satisfy immigration

requirements.  8 U.S.C. § 1324c(a)(1) and (2).

As mentioned above regarding Section 5, the federal government has adopted a pervasive

and comprehensive regulatory scheme regarding alien registration that includes the regulation of

registration materials.  The State of South Carolina has not previously regulated in this area.

Under Subsection 6(B)(2) and Section 15, the State would have the ability to initiate arrests and

prosecutions and judicially interpret state law regarding alien registration, all areas previously

under the exclusive control of the United States government.  Moreover, the state arrest and

prosecution of persons with false identifications could generate tensions with foreign nations and

retaliation against American nationals abroad, which support the argument of the United States

that such matters need to be under its exclusive discretion and control and are field preempted.

Therefore, the Court finds that plaintiffs have made a clear showing that they will likely

succeed on the merits of their challenge to Section 5 and Subsection 6(B)(2), and the United

States has made a clear showing that it will likely succeed on the merits of its challenge to Section 15, thereby satisfying the first of four prongs for the grant of a preliminary injunction regarding these sections of the Act. The Court will address the balance of the preliminary injunction standards regarding these sections in the remedy portion of this Order.

### B. Challenge to State Criminalization of Unlawful Presence

Subsections 4(A) and (C) of Act 69 make it a criminal offense for an unlawfully present person to allow himself or herself to be "transported or moved" within the state or to be harbored or sheltered to avoid apprehension or detection. There is no comparable federal statute, and it appears that this provision is unique in American law. Plaintiffs argue convincingly that this provision is the equivalent of unlawful presence, which is notable because the federal government has studiously avoided making unlawful presence a federal crime.[6] Instead, the federal government has made unlawful presence grounds for a civil removal proceeding, 8 U.S.C. §§ 1182(a)(6)(A)(i) and 1227(a)(1)(B) and (C), and has made unlawful presence an element of a criminal act only if the person has previously committed a felony and has been deported from, or voluntarily left, the United States after his or her conviction. *Id.* § 1252c(a).

It is well-settled that "[w]here a comprehensive federal scheme intentionally leaves a portion of the regulated field without controls, then the pre-emptive inference can be drawn–not from federal inaction alone, but from inaction joined by action." *P.R. Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988). Congressional intent can further be found in § 1252c, which expressly authorizes state and local law enforcement officers to make arrests pursuant to that section under the following specific circumstances: (1) the alien is illegally

---

[6] It is hard to imagine that an unlawfully present person would not necessarily be required to move or shelter himself as incident to living in a particular location or community. Thus, the provisions of Subsections 4(A) and (C) are found by the Court to be the legal and practical equivalent to criminalizing unlawful presence.

present in the United States; (2) the alien has previously been convicted of a felony and was

thereafter deported or left the country; (3) the alien has reentered the United States; and (4) the

state or local law enforcement officer has confirmed the suspect's status with the Immigration

and Naturalization Service. *See* 8 U.S.C. § 1252c. The striking limitations on the arrest powers

of state and local officials regarding unlawfully present aliens in § 1252c reflect that state

intrusion beyond that provided by statute is neither authorized nor welcome. Subsections 4(A)

and (C) go well beyond the strictures of § 1252c.

A review of Subsections 4(A) and (C) and the applicable provisions of federal

immigration law clearly demonstrates that Subsections 4(A) and (C) are field and conflict

preempted. These subsections seek to criminalize what Congress has chosen to treat only as a

civil offense. Congressional intent to adopt a pervasive and comprehensive scheme in this area

is clear, and further evidence of Congressional intent to limit the powers of the states to regulate

in this area is demonstrated by the restrictions on state and local law enforcement arrest powers

set forth in § 1252c. Therefore, the Court finds that plaintiffs have made a clear showing that

they will likely succeed on the merits of their challenge to Subsections 4(A) and (C) of the Act.

This satisfies the first prong for the grant of a preliminary injunction, and the Court will address

the balance of those prongs regarding these subsections in the remedy section of this Order.

### C. Challenge to Systematic State Plan Mandating Under Certain Circumstances Verification of Immigration Status of Persons Subject to Law Enforcement Encounters

Section 6 of Act 69 directs state and local government law enforcement officers who

have stopped, detained, investigated or arrested any person for whom they have a "reasonable

suspicion" may be unlawfully present in the United States to "when practicable . . . determine

whether the person is lawfully present in the United States." Act 69, § 6(A). A presumption of

lawful presence is established under the Act if the person has certain designated forms of picture

identification, such as a state issued driver's license, military identification or a United States

passport. *Id.* § 6(B)(1).  If the person subject to the law enforcement encounter does not possess

one of the acceptable forms of identification, the "officer shall make a reasonable effort, when

practicable, to verify the person's lawful presence in the United States." *Id.* § 6(C)(1).  The

statute identifies acceptable methods of inquiry, including contact with the United States ICE

Law Enforcement Support Center and the newly created Illegal Immigration Enforcement Unit

of SLED. *Id.* § 6(C)(1)(a)-(d).

Section 6 goes on to provide that, should the person be determined to be unlawfully

present in the United States, the officer, after consulting with appropriate state or federal

officials, will decide whether to retain custody or deliver the unlawfully present person to State

or federal officials.  The statute authorizes the officer to "securely transport the person to a

federal facility" without any requirement that the federal government assent to the delivery of the

person. *Id.* § 6(C)(4).

The United States asserts that its immigration enforcement policy focuses on the

identification, apprehension and deportation of certain classes of unlawfully present persons,

including those who "pose a clear risk to national security," "serious felons, repeat offenders or

individuals with a lengthy criminal record," "known gang members" or others "who pose a

danger to public safety," and individuals with "an egregious record of immigration violations."

(Memorandum from John Morton, Director, U.S. ICE, *Exercising Prosecutorial Discretion*

*Consistent with the Civil Immigration and Enforcement Priorities of the Agency for the*

*Apprehension, Detention, and Removal of Aliens* (June 17, 2011),

http://www.ice.gov/doclib/secure-communities/pdf/prosecutorial-discretion-memo.pdf; Dkt. No.

16-5 at 4 n.4).  The United States asserts that its enforcement efforts and immigration resources are directed toward those priority classes of unlawfully present persons and are fully absorbed in the pursuit of those priority targets.  (*See* Declaration of Daniel H. Ragsdale, Executive Associate Director of United States ICE, Dkt. 16-4).  The pursuit by state and local law enforcement officers of low priority targets through widespread traffic and street level dragnets mandated by Section 6 would, according to the United States, overburden federal immigration enforcement resources and disrupt the federal government's enforcement scheme.  (*Id.* at 17-26).

In the declaration submitted by Mr. Ragsdale of ICE referenced above, and not contested by any factual submissions of defendants, the United States has sufficient staff resources in immigration to apprehend, process and deport 400,000 unlawfully present persons a year. Through the 287(g) program and other initiatives, the United States has targeted unlawfully present persons in local and state detention facilities and has absorbed a significant amount of its resources with this high priority group.  (*Id.* at 10-11, 18-25).  The sudden delivery by South Carolina law enforcement officials to federal immigration officials of persons who do not fit the high priority federal government profile, and who may simply have encountered law enforcement officers as a result of a burned out tail light or jaywalking, would, per the United States, burden and disrupt federal immigration enforcement efforts.

The United States further asserts that the broad traffic and street level dragnet mandated by Section 6 could produce significant turmoil and tension with longtime American allies and neighbors within our hemisphere.  In a declaration submitted by Deputy Secretary of State William Burns, the implementation by South Carolina of "an inflexible immigration enforcement policy based narrowly on criminal sanctions" would "interfere[] with the national government's carefully calibrated policy of immigration regulation" and potentially cause "harm [to] a wide

range of delicate U.S. foreign relations interests." (Dkt. No. 16-2 at 5). Secretary Burns

identifies three principal types of potential harms to American foreign interests from the South

Carolina immigration statute: (1) "reciprocal and retaliatory treatment of U.S. citizens" with

"significant potential harm to the ability of U.S. citizens to travel, conduct business and live

abroad"; (2) antagonization of foreign governments, making them "less willing to negotiate with,

assist, or support the United States across a broad range of foreign policy issues," including

favorable trade and investment agreements, cooperation with counter terrorism and drug

trafficking operations and support in various international bodies; and (3) the threat of

undermining the standing of the United States in international bodies that address migration and

human rights matters. (Dkt. No. 16-2 at 7-8).

     Secretary Burns further notes that because of the potential foreign affairs implications of

immigration policies, the State Department "plays a substantial role in administering U.S.

immigration law and policy, as well as in managing and negotiating their foreign relations

aspects and impacts." (*Id*. at 11). Because of the sensitivity of immigration issues in many

foreign countries, immigration concerns are frequently raised in discussions and negotiations

with foreign governments. (*Id*. at 17). Secretary Burns asserts that it is, therefore, of vital

national concern that the federal government, and not an individual state, be responsible for the

development and implementation of such a delicate foreign policy issue as immigration. (*Id*. at

24-26). The Secretary concludes his declaration by asserting that Act 69 "runs significantly

counter to American foreign affairs interests, and . . . its enforcement would . . . undermine

American foreign policy." (*Id*. at 39). Defendants have offered no statements or other evidence

to counter Secretary Burns' declaration regarding the potential adverse impact of Act 69 on

American foreign policy interests.

It has long been recognized that "at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy, given the concern for uniformity in this country's dealings with foreign nations that animated the Constitution's allocation of the foreign relations power to the National government in the first place." *Garamendi*, 539 U.S. at 413. In Federalist Paper No. 42, James Madison, one of the principle draftsmen of the Constitution, observed the practical necessity of federal control of foreign affairs, noting that otherwise individual states would have the power to "embroil the Confederacy [as a whole] with foreign nations." The Federalist No. 42, at 237 (Forgotten Books, 2008). This point was reiterated by Alexander Hamilton in Federalist Paper No. 80 when he stated that the "Union w[ould] undoubtedly be answerable to foreign Powers for the conduct of its members." *Id*. No. 80, at 452. Hamilton went on to observe that the "peace of the WHOLE should not be left at the disposal of the PART." *Id*.

The simple principle that the Constitution vests the national government with certain fundamental indicia of national sovereignty, including the control of foreign policy and foreign affairs and the administration of immigration, has long been beyond dispute in our constitutional jurisprudence. In *Chy Lung v. Freeman*, 92 U.S. 275 (1875), the state of California adopted a statute authorizing a state officer to extract sums from newly arrived immigrants. The United States Supreme Court noted the potential foreign affairs implications of the state immigration rule and the risk of creating international conflict or retaliation. If an international inquiry were to be made, the Court noted, "[u]pon whom would such a claim be made? Not upon the State of California; for, by our Constitution, she can hold no exterior relations with other nations. It would be made upon the government of the United States." *Id*. at 279. Under the Constitution

of the United States, the power to pass such laws "belongs to Congress, and not the States." *Id.*
at 280.

The intimate relationship between the conduct of foreign affairs and immigration policy
was again addressed in the seminal state immigration regulation case of *Hines v. Davidowitz*.
The case involved Pennsylvania's effort to adopt a state alien registration system identical to the
federal system. Justice Black, writing for the Court, observed that "[o]ur system of government .
. . imperatively requires that federal power in the field affecting foreign relations be left entirely
free from local interference." 312 U.S. at 63. He went on to observe that "[e]xperience has
shown that international controversies of the gravest moment . . . may arise from real or
imagined wrongs to another's subjects inflicted, or permitted, by a government." *Id.* at 64. In
the area of alien registration, Justice Black asserted, the law of the nation must be supreme and
the laws of the states "must yield to it." *Id.* at 66. He concluded that "where the federal
government . . . has enacted a complete scheme of regulation and has therein provided a standard
for the registration of aliens, states cannot, inconsistently with the purpose of Congress, conflict
or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary
regulations." *Id.* at 66-67.

Statutes similar to Section 6 have been adopted by Arizona, Alabama and Georgia, and
there has been some division on the constitutionality of these provisions by the reviewing courts.
The majority view, represented by decisions involving challenges to the Arizona and Georgia
statutes, is that such provisions are likely preempted and should be enjoined. *United States v.
Arizona*, 703 F. Supp. 2d at 993-98, 1008, *aff'd*, 641 F.3d at 348-54; *Ga. Latino Alliance for
Human Rights*, 793 F. Supp. 2d at 1330-33. The minority view, represented by a decision

involving a challenge to the Alabama statute, is that such provisions are not likely preempted and should not be enjoined. *United States v. Alabama*, 2011 WL 4469941, at *27-38.[7]

Defendants contend that Section 6 is effectively authorized by § 1357(g)(10), which permits officers or employees of state or local governments without a written agreement "to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." Defendants contend that Act 69 is nothing more than an effort to cooperate with the federal government in the pursuit of the common goal of immigration enforcement. Since the State of South Carolina has now been sued by the national government over its adoption of Act 69, it begs the question of the meaning of the word "cooperate."

The Department of Homeland Security has issued a document titled Guidance on State and Local Governments' Assistance in Immigration Enforcement and Related Matters (Dkt. No. 29-11), which addresses the Department's interpretation of the meaning of the word "cooperate." The Department asserts that the duty to cooperate with the Attorney General necessarily requires federal primacy in immigration enforcement and requires any systematic state policy to be responsive to federal direction and priorities. (*Id*. at 8-12). The Department's interpretation of the statute, which it is charged to enforce, is due some deference. *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001) ("[A]n agency's interpretation may merit some deference whatever its form, given the specialized experience and broader investigations and information available to

---

[7] Defendants in this case and the Alabama district court exhaustively discussed Judge Bea's dissenting opinion in *United States v. Arizona*, 641 F.3d at 369-91. This Court found more persuasive Judge Noonan's brief and thoughtful concurring opinion in the same decision in which he focused upon the foreign affairs implications of the Arizona immigration statute. He observed: "What foreign policy can a federal nation have except a national policy? That fifty individual states or one individual state should have a foreign policy is absurdity too gross to be entertained. . . . [T]he federal nation must speak with one voice." *Id*. at 367.

the agency. . . and given the value of uniformity in its administrative and judicial understandings of what a national law requires."). Moreover, the Department's interpretation of the term "cooperate" comports with the overall structure of the INA (which places primary responsibility for immigration policy and enforcement on federal officials and limits state and local officials to narrow and specific responsibilities) and the long line of jurisprudence that recognizes the "power to regulate immigration is unquestionably . . . a federal power." *Whiting*, 131 S. Ct. at 1974 (citing *DeCanas*, 424 U.S. at 354).

It is apparent to the Court from a review of the legislative debate surrounding the adoption of Act 69 and the language of the Act itself that supporters of Act 69 do not approve of the federal government's strategy or actions regarding immigration enforcement. (*See* Dkt. Nos. 29-25 at 12, 13, 24; 29-26 at 47). These members of the General Assembly, of course, have every right to hold that opinion, but that opinion does not entitle the State of South Carolina to adopt its own immigration policy to supplant the policy of the national government. The supporters of Act 69 clearly seek to expand the pool of persons targeted for immigration enforcement beyond those high priority persons that are the focus of federal immigration policy. Far from seeking to "cooperate" with the federal enforcement strategy, they seek by Act 69 to "control" immigration policy and to alter it. (Dkt. No. 29-25 at 14). Further, state and local law enforcement officers are authorized to "securely transport" a person determined to be unlawfully present in the United States "to a federal facility." Act 69, § 6(C)(4). This action can be taken by a state or local law enforcement officer without any independent authorization so long as the unlawfully present person is not delivered to a federal facility outside South Carolina. *Id.* The policy choices reflected in Act 69 may be many things, but they are not an effort to "cooperate"

35

with the Attorney General.  Thus, § 1357(g)(10) does not provide the State a safe harbor for Act 69.

Section 6 is subject to both field preemption and obstacle preemption.  First, the federal government's regulation of immigration enforcement is so pervasive and comprehensive that it has not left any room for the state to supplant it.  *Gade*, 505 U.S. at 98.  This area has long been under the control of the national government, and the State of South Carolina has not traditionally regulated in this area.  *Whiting*, 131 S. Ct. at 1974.  Second, Act 69 burdens finite and limited federal immigration enforcement resources and acts as "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Gade*, 505 U.S. at 98.  Third, Act 69 improperly infringes on the federal government's exclusive control of foreign affairs.  No credible national sovereign can allow an individual state to embark on an independent immigration policy that exposes the national government to a disruption of its foreign relations and ability to conduct and control foreign policy.

The State of South Carolina is not without options to address its particular concerns with the federal government's immigration policy.  Section 1357 of the INA permits state and federal governments to enter into agreements to address specific matters or concerns of a state government.  For reasons that are not clear to the Court, South Carolina elected to forego an effort to negotiate its own agreement with the federal government and instead adopted Act 69.  (Dkt. No. 29-25 at 14).  Section 17(E) of Act 69, which is not affected by this Order, mandates that after January 1, 2012, the Chief of SLED negotiate a 287(g) agreement with the federal government.  Perhaps through good faith negotiations and frank discussion the State of South Carolina and the federal government can fashion an agreement to address, in whole or in part, the

36

concerns of state officials without unduly burdening federal resources or disrupting the foreign affairs of the national government.[8]

Based upon the foregoing, the Court concludes that plaintiffs have made a clear showing that they will likely succeed on the merits of their challenge to Section 6 of Act 69.  This satisfies the first of four parts of the preliminary injunction standard.  The balance of those preliminary injunction requirements will be addressed in the remedy portion of the Court's Order.

### Remedy

Plaintiffs, having made a "clear showing that [they] will likely succeed on the merits" of their preemption challenge to Sections 4, 5, 6 and 15 of the Act, are entitled to preliminary injunctive relief only if they can also make "a clear showing" that they are "likely to be irreparably harmed absent preliminary relief," that the balance of equities tips in their favor and that preliminary injunctive relief is in the public interest.  *Real Truth About Obama, Inc.*, 575 F.3d at 346-47.  Below, the Court addresses these requirements for each of the challenged sections of Act 69.

### A. Section 4

The challenges to Section 4 fall into two general categories, one relating to the subsections making it a state crime for third parties to harbor, shelter or transport unlawfully present persons (Subsections 4(B) and (D)), and the other relating to the subsections making it a state crime for unlawfully present persons to harbor, shelter or transport themselves (Subsections 4(A) and (C)).  Subsections (B) and (D) closely track existing federal criminal law, *see* 8 U.S.C.

---

[8] The Court notes that the United States did not challenge Section 7 of the Act, involving the mandating of verification of the immigration status of persons in state and local government prisons and detention centers.  This section of the Act does appear to further national immigration policy objectives, which is presumably the basis for the United States' decision not to challenge it.  This suggests to the Court that there may be common ground between state and federal officials for purposes of reaching a 287(g) agreement.

§ 1324, and were originally adopted in 2008 as S.C. Code § 16-9-460. Control of the prosecution and judicial interpretation of this area of statutory law has been traditionally a federal government prerogative. The United States asserts that the creation of an independent state regime of prosecution and judicial interpretation for those harboring, sheltering and transporting unlawfully present persons will disrupt and conflict with the comprehensive federal enforcement scheme. Further, the likely state prosecutions of lawfully present foreign nationals (who may be family and friends of the unlawfully present persons) could raise significant foreign relations issues. Moreover, the federal statute, 8 U.S.C. § 1324(a)(1)(C), provides an express safe harbor for persons who bring an alien to the United States to perform duties as a minister or missionary, and Section 4 provides no such safe harbor. This creates a real risk of persons being subject to state prosecution under Section 4 of Act 69 when the same conduct would be lawful under federal law. The United States asserts this conflict in state and federal law could create a chaotic situation in immigration enforcement.

Based on the foregoing, the Court finds that plaintiffs have made a clear showing that they will likely suffer irreparable injury should Subsections 4(B) and (D) become effective. The Court further finds that the balance of equities tips decidedly in plaintiffs' favor, and the public interest is served by the grant of preliminary injunctive relief. Therefore, the Court grants a preliminary injunction enjoining the enforcement of Subsections 4(B) and (D) of Act 69 and S.C. Code § 16-9-460 until further order of this Court.

Subsections 4(A) and (C) create the equivalent of a state crime for unlawful presence and, as such, create a conflict with federal immigration law which treats unlawful presence as a civil enforcement matter. Plaintiffs assert that this conflict between state and federal law would disrupt the federal enforcement scheme and create a potentially chaotic situation in which

previously civil enforcement matters would be criminalized under the South Carolina scheme. This obviously raises potential foreign affairs sensitivities, which were well articulated by Secretary Burns in his declaration. The Court finds that plaintiffs have clearly shown that they will suffer irreparable injury should these subsections become effective. The Court further finds that the balance of equities tips decidedly in favor of plaintiffs, and the public interest is served by the grant of preliminary injunctive relief. Therefore, the Court grants a preliminary injunction enjoining the enforcement of Subsections 4(A) and (C) of Act 69 until further order of this Court.

### B. Section 5

Section 5 closely tracks existing federal statutory law requiring the carrying of federal registration cards by aliens present in the United States. *See* 8 U.S.C. § 1304. Plaintiffs have provided the Court with evidence that this statute is now only rarely enforced by federal officials because the federal registration system does not cover numerous aliens lawfully present in the United States, including asylum seekers, victims of torture, persons cooperating with law enforcement officials in criminal prosecutions and other classes of persons who are lawfully present. Section 5 contains no safe harbor or exception for such classes of persons who do not have federal registration documents. Plaintiffs persuasively assert that state criminal prosecutions for the failure to carry federal registration materials under Section 5 could create a chaotic situation regarding the large classes of persons subject to state prosecution who would almost certainly not be subject to federal prosecution. The United States further asserts that it has exclusively controlled this area of the law, and a significant number of arrests under Section 5 could raise troublesome foreign relations issues and result in retaliation of American nationals abroad.

39

The Court concludes that plaintiffs have clearly shown that they will likely suffer irreparable injury should Section 5 be enforced. The Court further finds that the balance of equities clearly tips in favor of plaintiffs and that the grant of a preliminary injunction is in the public interest. Therefore, the Court grants a preliminary injunction enjoining the enforcement of Section 5 until further order of this Court.

### C. Section 6

Section 6, excepting the provisions of Section 6(B)(2), mandates that every law enforcement encounter with any person be infused with consideration of the person's legal status in the United States. If the officer has a "reasonable suspicion" that the person may be unlawfully present, Section 6 directs the officer to undertake certain inquiries and actions where "practicable." This state-mandated scrutiny is without consideration of federal enforcement priorities and unquestionably vastly expands the persons targeted for immigration enforcement action. The United States asserts that this state statutory scheme will disrupt federal enforcement operations and burden finite immigration enforcement resources. The breadth and volume of these state-mandated immigration inquiries and investigations would, according to the United States, raise significant foreign relations problems that would likely adversely affect American foreign policy interests.

The Court finds that plaintiffs have clearly shown that they will likely suffer irreparable injury should Section 6 be enforced. The balance of equities tips decidedly in favor of plaintiffs, and the public interest is served by the grant of preliminary injunctive relief. Therefore, the

Court grants a preliminary injunction enjoining the enforcement of Section 6 until further order of this Court, except as to 6(B)(2) which is specifically addressed below.[9]

Section 6(B)(2) makes it a state crime to possess or attempt to use a fraudulent I.D. for the purpose of establishing lawful presence in the United States.  The United States asserts that federal law now exclusively regulates this area and that enforcement of this subsection would create an independent scheme of prosecution and judicial enforcement outside the control of the federal government and without regard to federal immigration enforcement priorities.  The United States further asserts that discretionary decisions to treat certain matters as civil, rather than criminal, are carefully calibrated to accomplish immigration enforcement ends without unduly disrupting the nation's relations with foreign governments.  Since the South Carolina enforcement scheme is exclusively criminal in nature and outside the control of the federal government, the United States asserts that irreparable injury to the nation's foreign policy is likely.

The Court finds that the United States has made a clear showing that it will likely suffer irreparable injury should Section 6(B)(2) be enforced.  The equities tip in favor of the United States, and the public interest would be served by a grant of preliminary injunctive relief.  Therefore, the Court grants the preliminary injunction enjoining the enforcement of Section 6(B)(2) until further order of this Court.

---

[9] Nothing in this Order should be construed to prevent a state or local law enforcement officer, in the exercise of his or her discretion, from investigating any potential immigration law violation or from taking action in an immigration matter as may be authorized by federal law.  Since any state or local government immigration enforcement activity should be in cooperation with the Attorney General and in furtherance of federal enforcement activities, state and local officers should act consistently with federal immigration policy objectives as set forth from time to time in official circulars, policy statements and regulations of agencies charged with federal immigration enforcement.

**D. Section 15**

Section 15 prohibits the making or selling of counterfeit I.D.s for the use of persons unlawfully present in the United States. Private plaintiffs do not challenge this section. The United States asserts that this area is already addressed by the comprehensive federal immigration enforcement effort and that exclusive federal control of such matters is important. While the Court has found that the United States will likely prevail on its legal challenge that Section 15 is preempted by federal law, the Court is not persuaded that the United States will suffer irreparable harm should a preliminary injunction not be granted. Enforcement of this section does not appear to the Court to necessarily involve the arrest and prosecution of unlawfully present persons and would not likely raise the foreign policy sensitivities raised by other sections of Act 69 addressed above. The Court concludes that the United States has not made a clear showing that it will likely suffer irreparable harm should Section 15 be enforced, and therefore, the motion for preliminary injunction as to Section 15 is denied.

**Conclusion**

The Court hereby grants the motions for preliminary injunction regarding Sections 4, 5 and 6 of Act 69, and S.C. Code § 16-9-460, until further order of this Court.

AND IT IS SO ORDERED.

Richard Mark Gergel
United States District Judge

Charleston, South Carolina
December 22, 2011