IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| United States of America, | ) | Civil Action No. 2:11-cv-02958-RMG |
| Plaintiff, | ) | |
| v. | ) | |
| State of South Carolina, and Nikki R. Haley, in her official capacity as the Governor of South Carolina, | ) | |
| Defendants. | ) | |
| Lowcountry Immigration Coalition, et al, | ) | Civil Action No. 2:11-cv-02779 |
| Plaintiffs, | ) | |
| v. | ) | **DEFENDANTS' REPLY TO RESPONSES OF PLAINTIFFS ON LIMITED REMAND** |
| Nikki Haley, et al, | ) | |
| Defendants. | ) | |

The Defendants Governor Haley, Attorney General Wilson and State of South Carolina reply as follows to the responses of Plaintiffs United States and Lowcountry Immigration Coalition, *et al* as to the modification that should be made of the injunction of provisions of South Carolina law as a result of *Arizona v. United States*, 567 U.S. ___, 132 S. Ct. 2492 (2012). Contrary, to the assertion of the United States, the Defendants do not seek to convert this limited remand proceeding into one for general reconsideration of this Court's preliminary injunction, but they do stand by the arguments that they have previously made in these cases, and assert that

1

under *Arizona,* and its progeny, the injunction should be modified. *Arizona* clearly requires the lifting of the preliminary injunction of §6.

## ARGUMENT

### I

### THE INJUNCTION SHOULD BE LIFTED AS TO ALL PARTS OF SECTION 6 RELATED TO THE DETERMINATION OF LAWFUL STATUS INCLUDING TRANSFER OF CUSTODY UNDER §6(C)(4)

The United States "does not oppose defendants' assertion that this Court should dissolve its existing injunction as to the immigration status verification provision in Section 6 of Act 69 (ECF No. 105 at 5-8), provided that it is interpreted and applied narrowly as suggested by the Supreme Court's decision in Arizona (ECF No. 107 at 12-13). . . ."[1] Unlike the United States, the Lowcountry Plaintiffs continue to be out of step with *Arizona* as to this section and create distinctions that have no substantive effect on the application of *Arizona* to this case.

### A

### Section 6 (C) Does Not Permit Unauthorized Drop-offs of Unlawfully Present Persons and Lowcountry's arguments are foreclosed at this stage

#### 1

#### The law does not permit unauthorized drop-offs

Lowcountry continues to contend that §6(C) (S.C. Code Ann. § 17-13-170) authorizes South Carolina officials to detain individuals for purposes of transferring them to federal authorities for removal regardless of whether they have been instructed or permitted to do so by

---

[1] The United States does not appear to oppose lifting of the injunction of any part of section 6 other than the section 6(B)(2) regarding the use of counterfeit identification.

2

federal authorities.[2] Instead, the statute makes clear that such detention and transfer are to occur only pursuant to Federal authorization. The Defendants addressed this argument in their response to the opening memoranda, but it is renewed here in reply.

Lowcountry directs its argument to the following provision of §6(C):

> (4) If the officer determines that the person is unlawfully present in the United States, the officer shall determine in cooperation with the Illegal Immigration Enforcement Unit within the South Carolina Department of Public Safety [DPS] or the United States Immigration and Customs Enforcement [ICE], as applicable, whether the officer shall retain custody of the person for the underlying criminal offense for which the person was stopped, detained, investigated, or arrested, or whether the Illegal Immigration Enforcement Unit within the South Carolina Department of Public Safety or the United States Immigration and Customs Enforcement, as applicable, shall assume custody of the person. The officer is not required by this section to retain custody of the person based solely on the person's lawful presence in the United States. The officer may securely transport the person to a federal facility in this State or to any other point of transfer into federal custody that is outside of the officer's jurisdiction. . . .

The State respectfully differs with this Court's conclusion that "state and local law enforcement officers are authorized to "securely transport" a person determined to be unlawfully present in the United States "to a federal facility" [under] §6(C)(4). . . . without any independent authorization so long as the unlawfully present person is not delivered to a federal facility outside South Carolina." *U.S. v. South Carolina*, 840 F.Supp.2d 898, 923 (DCSC 2011). As discussed below, the Defendants take this position not as a request for reconsideration at this stage, but because it is consistent with *Arizona.*

The Defendants assert that this provision is not interpreted by them or the Department of Public Safety to permit the detention of individuals based on immigration status pending and

---

[2] Lowcountry also contends in a footnote that §6 violates the Fourth Amendment, but this Court did not enjoin that section on that basis and *Arizona* provides no authority for doing so.

during transfer to Federal authorities unless authorized by Federal officials[3]. As noted in the Defendants' response to Plaintiff's opening memoranda, the above provision expressly states that the decision to transfer custody is to be made "in cooperation with ICE or the DPS enforcement unit." This provision would bar an unauthorized drop-off at a Federal facility of an unlawfully present person. Absolutely nothing in this statute or State or Federal law would empower State law enforcement officers to force Federal authorities to accept custody of persons determined to be unlawfully present, and respectfully, to construe the statute otherwise would be an exercise in futility. *Nixon v. Missouri Mun. League*, 541 U.S. 125, 138, (2004), citing *United States v. American Trucking Assns., Inc.,* 310 U.S. 534, 543 (1940) "(Court will not construe a statute in a manner that leads to absurd or futile results); " *Johnson v. Collins Entm't Co., Inc*., 88 F. Supp. 2d 499, 509, n. 23 (D.S.C. 1999), vacated on other grounds, 199 F.3d 710 (4th Cir. 1999), quoting *State ex rel McLeod v. Montgomery*, 244 S.C. 308, 136 S.E.2d 778 (1964) ("court will reject interpretation of statute which leads to absurd result that could not have been intended—court must also presume legislature did not intend statute to be futile)."

Arizona's statute contains a somewhat similar provision for custody transfer to federal facilities that does not even stress cooperation as does the South Carolina statute.[4] The scope of

---

[3] The State can provide an affidavit of the Department of Public Safety confirming this interpretation if requested by the Court. The State will not provide it at this stage unless requested because this case is on limited remand, and the affidavit does not appear to be necessary in that the statute does not permit the detention of individuals based on immigration status pending and during transfer to Federal authorities absent Federal authorization

[4] A.R.S. § 11-1051 D:
> Notwithstanding any other law, a law enforcement agency may securely transport an alien who the agency has received verification is unlawfully present in the United States and who is in the agency's custody to a federal facility in this state or to any other point of transfer into federal custody that is outside the jurisdiction of the law enforcement agency. A law enforcement agency shall obtain judicial authorization before securely transporting an alien who is unlawfully present in the United States to a point of transfer that is outside of this state.

Arizona transfer provisions was not discussed by the Supreme Court apparently because it was not specifically challenged by the United States in that case, and the District Court had rejected the United States' request that the entire statute be enjoined. *U.S. v. Arizona*, 703 F.Supp.2d 980, 993 (DCAZ 2010). The decision of the United States not to launch a specific challenge to that provision in *Arizona* is consistent with its decision not to oppose the lifting of the injunction of §6 in South Carolina. Given the absence of an injunction or a challenge to the similar provisions in Arizona law, this Court should lift the injunction of §6.

As noted in the Defendants' response, Georgia has a similar custody transfer provision[5] and the Eleventh Circuit refused to enjoin it post-*Arizona*. *Georgia Latino Alliance for Human Rights v. Governor of Georgia,* 691 F.3d 1250 (11th Cir. 2012).[6] The Eleventh Circuit, also rejected the pre-enforcement challenge to similar provisions in Alabama law[7] *United States v.*

---

[5] Ga. Code Ann., § 17-5-100 (e):
> If during the course of the investigation into such suspect's identity, a peace officer receives verification that such suspect is an illegal alien, <u>then such peace officer may take any action authorized by state and federal law, including, but not limited to, detaining such suspected illegal alien, securely transporting such suspect to any authorized federal or state detention facility</u>, or notifying the United States Department of Homeland Security or successor agency. Nothing in this Code section shall be construed to hinder or prevent a peace officer or law enforcement agency from arresting or detaining any criminal suspect on other criminal charges. (emphasis added).

[6] In particular, the Court noted that "at oral argument, counsel for the State of Georgia emphasized that [Georgia] section 8 authorizes arrest and detention only to the extent permitted by federal law [and the Court found that] [t]his interpretation is consistent with the plain language of O.C.G.A. § 17–5–100(e)." *Id.* Under South Carolina's similar provision, the custody would have to be consistent with federal law as in Georgia.

[7] AL HB 56§ 12(e) provides that "[i]f an alien is determined by the federal government to be an alien who is unlawfully present in the United States pursuant to 8 U.S.C. § 1373(c), the law enforcement agency shall cooperate in the transfer of the alien to the custody of the federal government, if the federal government so requests." Although this Alabama provision expressly conditions transfer upon a request of the federal government, the only reasonable construction of South Carolina's §6 is that it would not authorize the drop-off of an alien at a Federal facility that did not want to take custody.

5

*Alabama*, 691 F.3d 1269, 1284 (11th Cir. 2012). Importantly, that Court stated that it could not conclude then that the state statute "will be construed in a way that creates a conflict with federal law." quoting *Arizona*, 132 S.Ct. at 2508. Accordingly, because §6(C)(4) can and should be construed so as not to conflict with Federal law, it should not be enjoined.

**2**

**These suits are facial challenges, and because §6 has a constitutional application that cannot be ruled out, the injunction must be lifted**

Enjoining the transfer of custody provision in this facial challenge is at odds with *Arizona.* Lowcountry points to that Supreme Court's statement that "it would disrupt the federal framework to put state officers in the position of holding aliens in custody for possible unlawful presence without federal direction and supervision." 132 S. Ct. at 2497. The Court used this language in its consideration of §2B of the Arizona statute regarding the determination of lawful presence, but Lowcountry overlooks the remainder of this passage that emphasizes that "[w]ithout the benefit of a definitive interpretation from the state courts, it would be inappropriate to assume §2(B) will be construed in a way that conflicts with federal law."[8] *Id.* Similarly, under *Arizona,* this Court should not assume that the transfer of custody provisions of §6C will be construed in a way that conflicts with federal law particularly when, respectfully, the law is quite clear on its face that unauthorized transfers of custody cannot be undertaken.

*Arizona*'s caution about the statute it was considering is consistent with constraints on facial challenges generally. *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449-51 (2008) explained the Court's disfavor of facial challenges as follows:

---

[8] *Arizona* continued with the following citation which is applicable here: "*Cf.* Fox v. Washington, 236 U.S. 273, 277 (1915) ("So far as statutes fairly may be construed in such a way as to avoid doubtful constitutional questions they should be so construed; and it is to be presumed that state laws will be construed in that way by the state courts" (citation omitted))."

Under *United States v. Salerno*, 481 U.S. 739 (1987), a plaintiff can only succeed in a facial challenge by "establish[ing] that no set of circumstances exists under which the Act would be valid," *i.e.*, that the law is unconstitutional in all of its applications. *Id.*, at 745. While some Members of the Court have criticized the *Salerno* formulation, all agree that a facial challenge must fail where the statute has a " 'plainly legitimate sweep.' " *Washington v. Glucksberg*, 521 U.S. 702, 739–740, and n. 7 (1997) (STEVENS, J., concurring in judgments). Washington's primary system survives under either standard, as we explain below.[note omitted] In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about "hypothetical" or "imaginary" cases. *See United States v. Raines*, 362 U.S. 17, 22, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960) ("The delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases thus imagined"). The State has had no opportunity to implement I–872, and its courts have had no occasion to construe the law in the context of actual disputes arising from the electoral context, or to accord the law a limiting construction to avoid constitutional questions. *Cf. Yazoo & Mississippi Valley R. Co. v. Jackson Vinegar Co.*, 226 U.S. 217, 220 (1912) ("How the state court may apply [a statute] to other cases, whether its general words may be treated as more or less restrained, and how far parts of it may be sustained if others fail are matters upon which we need not speculate now"). Exercising judicial restraint in a facial challenge "frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy." *Raines, supra*, at 22.

Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of "premature interpretation of statutes on the basis of factually barebones records." *Sabri v. United States*, 541 U.S. 600, 609 (2004) (internal quotation marks and brackets omitted). Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither " 'anticipate a question of constitutional law in advance of the necessity of deciding it' " nor " 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.' " *Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) (quoting *Liverpool, New York & Philadelphia S.S. Co. v. Commissioners of Emigration*, 113 U.S. 33, 39 (1885)). Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that " '[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.' " *Ayotte v. Planned Parenthood of Northern New Eng.*, 546 U.S. 320, 329 (2006) (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984) (plurality opinion)). It is with these principles in view that we turn to the merits of respondents' facial challenge to I–872.

Certainly, under either standard considered in *Washington Grange,* §6 has a "plainly legitimate sweep" and Lowcountry cannot show that "no set of circumstances exists under which the Act would be valid." Respectfully, the suggestion that the law might authorize unwanted drop-offs at Federal facilities is the just the kind of speculative construction which *Washington Grange* found to be an improper basis for a facially based challenge. As noted above, this speculation is not a basis for concluding that the statute "will be construed in a way that creates a conflict with federal law." *Arizona*, 132 S.Ct. at 2508.

B

**Any Detention Resulting from the Verification Process Under §6 is Consistent with *Arizona***

Lowcountry strains to make distinctions between South Carolina and Arizona law regarding detention during the determination of lawful status. Instead, the two states' provisions are very similar.

Section 6, now codified as S.C. Code Ann. §17-13-170 provides in pertinent part as follows

> (A) If . . . the officer has reasonable suspicion to believe that the person is unlawfully present in the United States, the officer shall make a reasonable effort, when practicable, to determine whether the person is lawfully present in the United States . . .
>
> (B)(1) If the person provides the officer with a valid form of any of the following picture identifications [*eg* driver's license, a United States or tribal issued picture identification] , the person is presumed to be lawfully present in the United States. . . .
>
> (3) If the person cannot provide the law enforcement officer with any of the forms of picture identification listed in this subsection, the person may still be presumed to be lawfully present in the United States, if the officer is able to otherwise verify that the person has been issued any of those forms of picture identification. . . .
>
> (C)(1) If the person does not meet the presumption established pursuant to subsection (B), the officer shall make a reasonable effort, when practicable, to verify the person's lawful presence in the United States by at least one of the

following methods: [Illegal Immigration Enforcement Unit within the South Carolina Department of Public Safety; an Immigration Alien Query through the International Justice and Public Safety Network; contacting the United States Immigration and Customs Enforcement's Law Enforcement Support Center;] or (d) . . . local field office.

(2) The officer shall stop, detain, or investigate the person only for a reasonable amount of time as allowed by law. If, after making a reasonable effort, the officer is unable to verify the person's lawful presence in the United States by one of the methods described in item 1), the officer may not further stop, detain, investigate, or arrest the person based solely on the person's lawful presence in the United States. . . .

(D) . . . This section must be implemented in a manner that is consistent with federal laws regulating immigration, protecting the civil rights of all persons, and respecting the privileges and immunities of United States citizens. . .

Arizona's statute provides, in part, as follows:

B. . . . where reasonable suspicion exists that the person is an alien and is unlawfully present in the United States, a reasonable attempt shall be made, when practicable, to determine the immigration status of the person, . . . The person's immigration status shall be verified with the federal government pursuant to 8 United States Code § 1373(c). . . .A person is presumed to not be an alien who is unlawfully present in the United States if the person provides to the law enforcement officer or agency . . . A valid Arizona driver license . . . A valid Arizona nonoperating identification license . . .

E. In the implementation of this section, an alien's immigration status may be determined by:
1. A law enforcement officer who is authorized by the federal government to verify or ascertain an alien's immigration status.
2. The United States immigration and customs enforcement or the United States customs and border protection pursuant to 8 United States Code § 1373(c). . . .

L. This section shall be implemented in a manner consistent with federal laws regulating immigration, protecting the civil rights of all persons and respecting the privileges and immunities of United States citizens.

Ariz. Rev. Stat. Ann. § 11-1051.

Lowcountry argues that the Arizona statute does not set forth the circumstances under which an individual must continue to be detained if they do not meet the presumption of lawful

presence, but it does do so. Arizona §11-1051(B) states that "a reasonable attempt shall be made . . . to determine immigration status[and that] status shall be verified with the federal government" just as South Carolina law provides that "the officer shall make a reasonable effort, when practicable, to verify the person's lawful presence in the United States by at least one of the following methods . . . ." §17-13-170. These verifications are terminated in both States if the presumption of lawful presence is met by the production of identification such as a driver's license. The verifications in South Carolina are also terminated when verification cannot be made or if further detention or verification would exceed "a reasonable amount of time as allowed by law," but Arizona law provides no such cut-offs. Both States require that implementation be "consistent with federal laws regulating immigration."

As noted in the Defendants' Response to Plaintiffs' opening memoranda, the Supreme Court rejected the similar argument "that, in practice [under Arizona law], state officers will be required to delay the release of some detainees for no reason other than to verify their immigration status." 132 S. Ct. at 2509. The Court concluded that "[a]t [that] stage, without the benefit of a definitive interpretation from the state courts, it would be inappropriate to assume [Arizona] § 2(B) will be construed in a way that creates a conflict with federal law." *Id.* at 2510. Accordingly, Lowcountry's speculative concerns about the construction and application of §6 are foreclosed at this stage by *Arizona's* refusal to assume that the similar statute before it would be construed in a way that would conflict with federal law.

## C

## Certification Is Unnecessary

Lowcountry misunderstands the Defendants' position regarding certification as agreeing that this case may be certified to the extent that this Court "finds that [South Carolina's] immigration verification scheme lacks a definitive interpretation." Response at p. 6. The Defendants' position instead has been that certification is unnecessary and that certification should be denied with a reservation of rights to seek certification later should it be necessary.[9]

## D

## Lowcountry's Back-up Request for Reconsideration of an Injunction of §7 Should be Rejected

Lowcountry argues that Section 7 regarding transfer of custody of State prisoners to Federal facilities should be enjoined if this Court decides to lift the injunction of §6. This request for an injunction as to a section not now subject to an injunction goes beyond the scope of the limited remand of this case for any needed modification of the District Court's Order due to *Arizona*. Nothing in *Arizona* calls for an injunction of the provisions of §7. Moreover, Lowcountry's argument as to §7 relies on the same argument it made against §6, which is that it allows for transfers to Federal custody without Federal consent. Again, nothing in either §6 or

---

[9] The Defendants included the following statements in both their opening memorandum and responses:
> [b]ecause of the express provisions in South Carolina's statute for detention only for "a reasonable amount of time as allowed by law," South Carolina's statute lacks the "basic uncertainty about what the law means and how it will be enforced" which the Supreme Court found in the Arizona statute. *Arizona*, 132 S. Ct. 2510. . . . Nevertheless, the State reserves the right, in the instant case, to seek certification to the South Carolina Supreme Court of any questions of statutory interpretation should such interpretation be necessary at a later stage of this proceeding.

§7 supports a reasonable argument that unlawfully present immigrants may be dropped off at Federal facilities without the consent of Federal authorities.

## II

### THE PRELIMINARY INJUNCTIONS SHOULD BE LIFTED AS TO SECTIONS 4, 5, AND 6(B)(2)

The Defendants stand by their arguments regarding these sections set forth in their opening memorandum on limited remand[10] and their memorandum in opposition to preliminary injunction. As noted above, they are not seeking to convert this limited remand proceeding into one of general reconsideration, but they do not abandon their positions that none of these sections should be enjoined.

## III

### THE UNITED STATES DOES NOT REQUEST AN INJUNCTION AGAINST SECTION 15 ON LIMITED REMAND

The United States asserts that this Court should modify its reasoning for finding a likelihood of success on the challenge to section 15, but it does not request an injunction. This Court declined an injunction as to section 15 because it found that "the United States has not made a clear showing that it will likely suffer irreparable harm should Section 15 be enforced." 840 F. Supp. 2d at 927. Nothing in *Arizona* would change the harm component nor does it

---

[10] Although the Defendants' opening memorandum stated that Alabama did not have a self-harboring provision, that State does have conspiracy provisions in relation to concealment and transportation, and the Eleventh Circuit affirmed the injunction of the statute in which they are contained. Ala. Code § 31-13-13.

The United States, in its response, states that nothing in *Arizona* addresses the elimination of parole under the Arizona statute, but that decision did state that "State law, by contrast, rules out probation as a possible sentence (and also eliminates the possibility of a pardon)." 132 S. Ct. at 2503.

require modification of the likelihood of success component. Section 15's penalizing creation of false identification is sustainable as a check on criminal activity of a fraudulent nature as is §6(B)(2) regarding display of a false identification. Although, as recognized in the State's opening memoranda, *Arizona* did find that "the Federal Government has occupied the field of alien registration . . . [and that] [w]here Congress occupies an entire field, as it has in the field of alien registration, even complementary state regulation is impermissible" (132 S. Ct. at 2502), these sections relate to the field of registration only contextually. Their direct effect is on fraud.

## IV

## FEDERALISM WARRANTS DISSOLVING THE INJUNCTION

Lowcountry contends that maintaining the injunction is consistent with Federalism. Their view of *Arizona* is quite different from that of Defendants. As set forth in Defendants' opening memorandum, *Arizona* recognized that principles of federalism often preclude the issuance of broad-based injunctions in facial, pre-enforcement attacks upon state criminal statutes, particularly in a suit brought by the United States against a sovereign state. These principles provide a strong basis for lifting the injunction as to §6 and all other affected parts of Act 69. As noted in Defendants' earlier memorandum, should this Court wish to hear these arguments in detail, we will, upon the Court's request, gladly prepare memoranda and argue them further.

## CONCLUSION

The Defendants State of South Carolina, Governor Haley and Attorney General Wilson respectfully request that this Court lift the preliminary injunction in this case. The Defendants reserve all claims and defenses that they have in this case including their arguments made in

opposition to the motions for preliminary injunctions and on appeal[11].

Respectfully submitted,

ALAN WILSON
Attorney General
Federal ID No.10457

ROBERT D. COOK
Deputy Attorney General
Federal ID No. 285
Email: AGRCOOK@SCAG.GOV


/s/ J. Emory Smith, Jr.
J. EMORY SMITH, JR.
Assistant Deputy Attorney General
Federal ID No. 3908
Email: AGESMITH@SCAG.GOV
Post Office Box 11549
Columbia, South Carolina 29211
Phone: (803) 734-3680
Fax: (803) 734-3677

Counsel for Defendants Governor,
Attorney General and State

October 24, 2012

---

[11] Because the orders of the Fourth Circuit Court and this Court appear to limit the parties to arguing the effect of *Arizona* on this case, the Defendants have not argued other issues. Should this Court want to hear any arguments on other issues, upon the Court's request, the Defendants will gladly prepare memoranda for the Court on the issues and argue them in Court. Unless the Court so orders, the Defendants limit their arguments to the effect of the *Arizona* case as set forth above and reserve their rights on appeal.